## Pope v. Pope.

(Decided November 18, 1914.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

1. Divorce—Proof Not Authorizing a Divorce a Vinculo May Be Sufficient To Authorize a Divorce a Mensa et Thoro.—Where all the evidence introduced for the wife shows that she has a strong affection for her husband and child, is regardful of her marital duties and is not of a fault-finding or complaining disposition; and further, that the husband is fault-finding and wholly unappreciative of the obligations he owes to the wife and fails to provide a support for her and their child; and such evidence is uncontradicted by any evidence introduced by the husband, the presumption will not be indulged from her leaving him that she did so without fault upon his part. In such case the husband does not relieve himself of blame by merely showing that the wife left him. His testimony must go farther and show some cause for her doing so. Evidence examined and held sufficient to authorize the granting to the wife of a divorce a mensa et thoro.

2. Children—Custody of Child—When It Should go to Mother.— Where parents are separated by divorce, although prima facie the abstract right and duty of the father are superior to those of the mother, yet the court dissolving the union should confide the care and custody of their infant child to the parent most trustworthy and capable; and if neither of them shall be worthy of such a trust, the interest of the child may authorize the transfer of the custody to a third person. If the child has reached years of discretion its wishes will be considered, but will not always control. As between the parents the tendency of the courts is to

give a very young child to the mother. In this case, the child being only three years of age and the mother being shown by the evidence in all respects fitted to have its care and training, the action of the circuit court in giving its custody to the mother is approved.

LESLIE T. APPLEGATE and LEWIS L. MANSON for appellant.

JAMES B. O'NEAL for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellee, Ruth Pope, and the appellant, Harley Pope, were married at Covington, Kentucky, on the 1st day of February, 1910, and they have one child, a daughter, Mildred Ruth Pope, now about three years of age. On the 7th day of May, 1912, this action was instituted by appellee against appellant in the Kenton Circuit Court, Common Law and Equity Division, seeking a divorce from him *a mensa et thoro* upon the grounds: (1) That he habitually behaved toward her for not less than six months in such a cruel and inhuman manner as to indicate a settled aversion to her and to destroy permanently her peace and happiness; (2) That he neither could nor would make suitable or any provision for the maintenance of appellee and their child; (3) That by order of the appellant she and her child were compelled to leave his home and seek refuge with her sister, Mrs. Thomas Jackson, at Latonia, a suburb of Covington; (4) That after being driven from appellant's home and while she was ill in a hospital in Covington from the effects of a wound, he took from the custody of her sister, Mrs. Jackson, their infant daughter and removed her to the home of his parents and there detained her, even refusing to take or send her to visit appellee while she remained in the hospital, which greatly aggravated her illness and caused her great unhappiness.

It was further alleged in the petition that appellant and his parents still have the possesion of the child and he threatens that appellee shall never have its custody; that neither appellant nor his parents are financially able to rear and educate the child, nor are they morally fitted to do so, but that appellee is financially and morally able and fitted to have the custody of the infant and to rear and educate her. Following the filing of the petition an order of injunction was issued by the circuit court and served upon the appellant, restraining him from remov-

ing the child from Kenton County until such time as the court could hear and determine the rights of the parties.

On July 23, 1912, appellee filed an amended petition making more specific the grounds for divorce contained in the original petition, and alleging the additional ground that she had been abandoned by appellant and that such abandonment had continued for a year before the institution of the action; that the acts on the part of appellant constituting the grounds for divorce occurred in this State, within five years next before the institution of the action, and that she was without fault with respect to same. The amended petition also set up a claim for alimony and by its prayer a divorce *a vinculo* was asked.

On May 12, 1913, which was a year after the institution of the action, appellant filed an answer and counterclaim denying the allegations of the petition as amended and asking that a divorce *a vinculo* be granted him, alleging as the ground therefor that the appellee, without fault on his part, abandoned him and that such abandonment had continued for more than a year before the filing of his answer. The averments of his answer were controverted by reply, and with the issues thus made up the evidence was taken.

By the judgment rendered the circuit court dismissed appellant's counterclaim for a divorce, but granted appellee a divorce from bed and board, gave her the custody of her infant daughter and alimony at the rate of $15.00 per month for the support of the child, which appellant was required to pay on the first day of each month; also allowed her $50.00 as a fee to her attorney and the costs of the action. That part of the judgment relating to the custody of the infant, Mildred Pope, is as follows:

"That the plaintiff be and is hereby granted the custody and control of the infant daughter of the parties, Mildred Pope, until the further order of the court. The defendant shall be permitted to visit and see his said child at such times as the parties shall agree upon. If the parties are unable to agree, then upon application the Court will extend this order so as to fix them."

Appellant complains of the judgment and has appealed from so much thereof as refused him a divorce and gave the custody of the infant, Mildred Pope, to appellee.

It is not our purpose to go into details as to the several acts of appellant which are relied on by appellee as

constituting the grounds for divorce alleged, or as to the evidence controverting them, but merely to state the salient facts and the conclusions at which we have arrived from a careful consideration of all the evidence, together with such conclusions of law as, in our opinion, are applicable thereto.

It appears from the evidence that appellee prior to her marriage lived with her married sister, Mrs. Burton, in Huntington, West Virginia, and that upon a visit to her sister, Mrs. Jackson, at Latonia, Kentucky, she was secretly married to the appellant. Following the marriage she returned to her sister's home in Huntington and shortly thereafter informed the latter of her marriage. Thereupon appellee's brother-in-law, Burton, obtained a position for appellant in the shops of the Chesapeake & Ohio Railway Company at Huntington and caused him to remove to Huntington and accept the position, upon doing which he and appellee made their home with Mr. and Mrs. Burton at that place. They lived in Huntington and with the Burtons until May, 1911, on which date appellant seemed to have lost his position with the railway company, and he then returned to Latonia and after remaining there a short time secured a position at Clifton Forge, Virginia, which he soon left and went West, later returning to Covington, in January, 1912, where, at his request, he was followed by appellee, who took up her residence with him in that city. They lived together in Covington until March, 1912, when the separation between them took place. It appears, therefore, that they had lived in this State about three months when the separation occurred.

Much of the evidence appearing in the record relates to the acts and conduct of the parties while residents of Huntington and illustrates their temperaments and characteristics as manifested in their lives there. While it is true, as contended by counsel for appellant, that none of his acts during his residence at Huntington can constitute grounds for a divorce in this State, unless they would authorize a divorce in West Virginia, which is neither alleged in the petition nor proved, they are nevertheless competent to be considered in connection with evidence of similar subsequent acts occurring in this State which would tend to illustrate appellant's disposition, and show that his conduct toward appellee in this State was such as would conduce to establish a cause of action for divorce arising in this State. In Robards v.

Robards, 33 R., 565, we held that where the cause of
divorce alleged is the doing of an act at a specified time
or within a given period, it is competent to show the com-
mission of similar acts both prior and subsequent to the
acts alleged, as tending to show a disposition to commit
the act or acts specifically complained of.

According to the evidence, for a while after their
marriage appellant and appellee seemed to live happily
and the former apparently did his duty in supporting
and caring for appellee, but later on he appeared to be-
come discontented, surly and neglectful of his wife and
child, his conduct toward them so changing that he left
them as a burden upon her relatives, Mr. and Mrs. Bur-
ton, and from time to time absented himself from Hunt-
ington without letting appellee know where he was. That
at times he also drank to excess, and on one occasion, at
least, admitted being guilty of an act of cruelty to his
wife. In other words, his acts and conduct in West Vir-
ginia and later in Kentucky, manifested a want of appre-
ciation of the obligations resting upon him by reason of
his marriage; the fact that such acts and conduct were
similarly continued upon his part after he left Hunting-
ton and during his residence with appellee in Kentucky,
showed that his conduct towards her was habitually such
as manifested an irritable disposition, indifference to
her feelings and a wanton disregard of her happiness
that continued throughout their married life.

The evidence also shows that appellant had a dislike
for and was jealous of appellee's relatives and that he
frequently abused them to her. On one occasion, accord-
ing to the testimony of appellee's sister, Mrs. Jackson,
she heard appellant and appellee quarreling and going
to them found appellee in a nervous state of mind. She
asked them what caused the trouble, whereupon appellee
told her in the presence of appellant that he had told her
to leave; that this was the third time he had told her to
leave, and when Mrs. Jackson appealed to appellant as
to the truth of her statement he replied: "Let her go."
At the time of this occurrence neither appellant nor
appellee explained what had occurred to bring about the
quarrel. There was then no separation, however, be-
tween the parties, and except at such time as he was away
from home they continued to live together until the last
of March, 1912, when the final separation occurred. On
March 30th appellee went to the house of Mrs. Jackson,
her sister, and told her that the appellant had ordered her

to leave home, and on the day following she carried her child and personal effects to Mrs. Jackson's, stating when she arrived there that appellant had again told her to leave. Appellee was not introduced as a witness and she claims that her failure to testify was because her attorney did not know of the statute, recently enacted by the Legislature, which permitted her to do so, until after he had introduced other witnesses in her behalf. It is apparent, therefore, that Mrs. Jackson's testimony as to what appellee told her when she went to her house, being mere hearsay, was incompetent as evidence.

Appellant was introduced as a witness in his own behalf and his testimony was that on the day appellee took her personal effects and the child and went to Mrs. Jackson's, she told him "she was going over to her sister's house and was going to stay there," and that, in response, he told her: "When she got over there if she thought more of her sister than she did of me to stay there." His testimony gives no explanation of what occurred between them that caused appellee to leave. It disclosed nothing else that was said by either of them before or after the conversation referred to, nor did he indicate that there was any difficulty or quarrel which resulted in the conversation to which he testified. As it is abundantly shown by the evidence that appellee had a warm affection for her husband, notwithstanding his long misconduct toward her, it is not to be believed that he pleasantly sent her away without any cause and without fault on his part, or that she voluntarily left him without cause. On the contrary, there must have been a cause for her leaving. It no doubt resulted from some unpleasantness or quarrel occurring preceding her departure, but, whatever the cause, it is not disclosed by the record. But when his chronic irritability of disposition and his previous habitual conduct towards appellee, together with his confessed failure to ask her to return to him, is considered, it is not probable that he was free of blame for the separation.

In the absence of evidence conducing to show that appellant was wholly in fault as to the separation it is our conclusion that appellee is not entitled to a divorce a vinculo upon the ground of his abandonment of her. On the other hand, as the evidence does not show that the separation resulted wholly from the fault of appellee, we further conclude that appellant is not entitled to a divorce a vinculo upon the ground of her abandonment

of him, as alleged in his counterclaim. Where, as in this case, all the evidence introduced in behalf of the wife shows ·that she has a strong affection for her husband and child, is regardful of her marital and household duties and is not of a fault-finding or complaining disposition; and further, that the husband is fault-finding and wholly unappreciative of the obligations he owes to her and has upon a previous occasion ordered her to leave him without assigning any cause therefor, and such evidence is uncontradicted by any evidence introduced by the husband, the presumption will not be indulged that, 'because the wife has left the husband, she did so without any cause or fault upon his part. In such a state of case the husband does not relieve himself of blame by merely showing that the wife left him. His testimony must go farther and show some cause for her doing so. Adair v. Adair, 31 R., 956.

After the separation and while with her infant child at her sister's in Latonia, appellee wrote to her sister in Huntington for money with which to go to Huntington and take her child. Before receiving an answer to this letter appellee left a note at her sister's in Latonia in which she said:

"I am over at Ada Pope's. Bring food for babe. I have disgraced all my people and I must do this or lose my mind."

Before going over to Ada Pope's she got a pistol from her sister's house which she carried with her. Upon arriving at Ada Pope's she left her child in a front room, went to the kitchen and shot herself. The wound was in her arm and of so severe a character that it rendered its amputation necessary, so she went to a hospital and it was there taken off between the elbow and shoulder. This attempt at self-destruction evidently resulted from the unhappiness and desperation of mind caused by her separation from the appellant. It appears from the evidence that long before her marriage and while a girl in school, appellee became nervous, suffered occasional fainting spells and was at times depressed in mind. According to her physician this condition was due to a female trouble which was later removed by an operation, since which time there was never anything to indicate that she was other than normal. Her act in shooting herself would be well calculated to indicate that her mind was not then normal, but numerous witnesses

testifying in her behalf say that there has never been, since she was wounded, a return of the extreme nervousness or desperation of mind with which she was then afflicted.

While appellee was confined in the hospital with the wound which she had received, appellant seemed to have been momentarily so aroused by what had happened to her that he went to the hospital to see her, but such interest as was manifested by that act quickly subsided, and he did not again visit her at the hospital or show any concern about her. He received from appellee a note while she was in the hospital, asking him to bring their child to see her there, but this request he refused to comply with, without any apparent reason for such refusal. During the stay of appellee at the hospital the child was confided to the care of her sister, Mrs. Jackson. In a few days after the child was taken to Mrs. Jackson's, appellant called at her residence and under the pretense of taking the child for a walk, took her to the home of his parents, where she has since remained. His conduct in taking the child from Mrs. Jackson's under such pretense and without imparting to her his intention of taking her to his mother's to stay, but illustrates the same disposition indicated by many other similar acts of his presented by the record. An appreciative man, grateful to Mrs. Jackson for the care bestowed upon his child under such circumstances, would, if for any sufficient reason he desired to take the child to his mother's for future care, at least have expressed to her his gratitude for what she had done for the child and explained why he purposed taking her to his mother. Not only did he obtain the possession of the child in the surreptitious way indicated, but when appellee became able to leave the hospital and went to see the child at the home of appellant's parents, he would object to her visits and to the persons who would accompany her; and when appellee obtained an order from the court permitting her to visit the child in company with her sister, appellant took the child and concealed himself with it in the cellar to prevent appellee from seeing it. Upon numerous other occasions he manifested a disposition to make her visits to the child as unpleasant as possible, doing everything in his power to harass and annoy her. Obviously, such conduct upon his part, together with his previous treatment of appellee before their separation, manifested not only a total want of affection for her, but

a settled aversion toward her and the utter absence of any consideration for her feelings as well.

In view of all the evidence the circuit court would have been justified in granting appellee a divorce *a vinculo*, but for the fact, that it did not go far enough to show that the cruel conduct on the part of appellant toward appellee was indulged in in this State, or for a period of six months next before the institution of her action; the requirements of the statute being that the acts constituting the cruel treatment must occur while the parties are residents of this State and must have continued for as much as six months before the institution of the action. The requirements of the statute, however, in the particulars indicated, do not apply to the granting of a divorce from bed and board, and as the facts presented by the record entitled the appellee to a divorce of that character, we approve the action of the lower court in granting it.

The only question remaining to be considered is as to whether the circuit court by its judgment properly bestowed the custody of the child, Mildred Pope. The law as declared in this jurisdiction is, that where a child of divorced parents has reached years of discretion, its wishes as to its custody will be considered, but are not controlling. In such cases, however, the custody of very young children will generally be awarded to the mother. A recent declaration of the law on this subject will be found in Shallcross v. Shallcross, 135 Ky., 418, in the opinion of which it is said:

"The right of the father to have the custody of his child is, in its general sense, admitted, but this is not on account of any absolute right of the father, but for the benefit of the infant; the law presuming it to be for its interest to be under the care of its natural protector, both for maintenance and education. Neither the father nor mother, however, has any right that can be allowed to seriously militate against the welfare of the child. If the father be unfit to have the custody of his child, the courts will promptly declare his rights forfeited. The same is true of the mother, and neither parent is entitled to the custody, if it is manifestly against the child's welfare. In such a case the custody of the child will be awarded to a third person. If the child has reached years of discretion, its wishes will be considered, but will not always control. As between the parents, the tendency of the courts is to give very young children to the mother

especially in cases of divorce. Our meaning has been admirably expressed by Judge Robertson in the opinion in Adams v. Adams, 1 Duv. 167, as follows: 'The welfare of infancy, involving that also of the Commonwealth, defines the sphere of parental duties and rights, and these preferred rights and duties are correlative. The character and destiny of the citizen are molded by the domestic tutelage of the nursling. Therefore, whenever the parents are separated by divorce, although prima facie the abstract right and duty of the father are superior to those of the mother, yet the court dissolving the union should confide the care and custody of their infant child to the parent most trustworthy and capable, and if neither of them shall be worthy of such a delicate and eventful trust, the interest of the child and the public may authorize the transfer of the custody to a stranger.' "

As between the father and mother in this case the fitness of the latter to have the custody of their infant daughter is abundantly shown by the evidence appearing in the record. Her family and acquaintances, among the latter physicians, so testify, knowing her past life, the desperation of mind which caused her to inflict upon herself the wound resulting in the loss of her arm and the circumstances leading to the act. They all agree that her temperament, affection for the child, habits of life and ability to labor, notwithstanding the loss of her arm, make her a suitable person to care for and rear it; and, in view of what her sisters and their husbands have done for her, there can be no doubt of the sincerity of their assurances of assistance to be given her in the future care of the child. On the other hand, the father's irritable disposition, fits of sullenness and ill temper, tendency to rove, and irregular habits, disqualify him to properly care for and rear the child; and though his parents have manifested an affection for her and willingness to give her a home and necessary care, in view of the superior fitness of appellee, and the sex and tender age of the child, the action of the circuit court in awarding it to her was fully justified. Moreover, we are of opinion that the good of the child demands that the circuit court compel her immediate delivery by appellant to appellee.

Judgment affirmed.