## Burns v. Burns.

(Decided January 9, 1917.)

## Appeal from Robertson Circuit Court.

1. Divorce—Review of Judgment for as to Alimony.—This court cannot reverse a judgment for absolute divorce, but it can review the evidence for the purpose of determining whether alimony should be allowed or disallowed, and if allowed, fixing the amount thereof.

2. Divorce—Alimony—Evidence.—Although the evidence may not be sufficient to authorize the granting of an absolute divorce, still it would be proper to allow alimony if the evidence authorized the granting of a divorce a mensa et thoro.

3. Divorce—Separation From Bed and Board—Evidence.—Where the evidence shows that the husband, who is the defendant in the suit, frequently visited the home 'of a tenant on his farm when the wife of the tenant was present and the husband absent, and was frequently seen in company with and associating with the wife of such tenant under circumstances indicating undue familiarity, and which conduct was persisted in after solemn protest by the wife, the plaintiff in the divorce proceeding, and where the woman involved upon the birth of a child named it for the husband, the defendant in the divorce suit, and other facts appearing of a more or less suspicious and guilty nature, there was at least sufficient grounds to grant a separation from bed and board if not to support an absolute divorce.

4. Divorce—Alimony—Discretion of Court.—The amount of alimony is always a matter within the sound discretion of the court trying the case, which means that the court must endeavor to do exact justice between the parties under the facts as they appear, and where the wife is shown to have been a faithful, economical and industrious woman throughout the married life of the pair, and has assisted her husband to accumulate during that time, in addition to what he already had, a sum of more than $12,000.00, and where she is not found guilty of any disloyal, untrue, or even harsh conduct, it would not be abuse of a sound discretion to allow her, after divorce is granted, a lump sum of one-third of the combined accumulations which in this case is $4,000.00, and she should furthermore be adjudged the possession of such articles of household furniture as is conclusively shown she purchased with her own means from her individual earnings.

5. Divorce—Allowance of Attorney's Fee to Wife.—Where there are no complicated legal questions, and the evidence shows the facts substantially as above indicated, and the testimony is not unusually lengthy, the allowance to the wife of an attorney fee of $300.00 is deemed sufficient.

R. L. NORTHINGTON, JOHN P. McCARTNEY, ROBERT BUCKLER and WORTHINGTON, COCHRAN & BROWNING for appellant.

M. C. SWINFORD for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming on the appeal and reversing on the cross-appeal.

The appellee, to whom we shall refer as plaintiff, filed her suit in the court below against appellant, to whom we shall refer as defendant, seeking from him an absolute divorce from their bonds of matrimony, and to recover from him the sum of $4,000.00 alimony, and the further sum of $1,500.00 alleged to be due her under a written contract entered into between them on November 6, 1911, and some further items for money which she claims to have advanced to her husband from time to time during their married life. She furthermore sought to recover and have restored to her the following articles of personal property which she claimed to have purchased and placed in the home with her own means: One Davis sewing machine, one organ, five rugs, a bed, a washstand, six rockers, a dining room safe and hall tree. She furthermore claimed that she had purchased several other articles for the home, but they are neither specified in the petition nor, so far as we are able to discover, in the proof.

The grounds alleged in the petition for the divorce which she seeks by the petition and the amendment thereto are: (1) habitually behaving toward her by her husband for a period not less than six months in such cruel and inhuman manner as to indicate a settled aversion to her and to destroy permanently her peace and happiness; and (2) living in adultery with another woman.

The trial court granted to the plaintiff an absolute divorce and adjudged to her alimony in the sum of $3,500.00 and restored to her the organ, but dismissed the petition as to all other relief prayed for, and from that judgment the defendant prosecutes this appeal and the plaintiff has procured a cross-appeal in this court.

The questions presented are ones purely of fact to be gathered from the testimony in the record, with the application of the rules of law prevailing in this state in such cases. A brief statement of the facts shown by the record will be necessary to a proper understanding and adjustment of the unfortunate differences that have arisen between this husband and wife.

They were married in 1895 in Kentontown, Kentucky, near where the husband lived with his mother on a farm valued at about $4,000.00. At that time he

was about thirty years of age, and his bride only fifteen years of age. After living at this place some few years, another farm was purchased near Sardis, in Mason county, to which the couple removed and where they resided until the early part of the year 1915, when that farm was sold for $16,700.00, about half of which was paid in cash, and the other in deferred payments. After the sale of the farm they moved to the town of Sardis, where they resided until the separation occurred.

Aside from cultivating the farm, for a number of years the defendant had been engaged in operating a team between the cities of Maysville and Mt. Olivet with which he hauled freight to and fro between said places and also for intervening points. This character of work necessarily kept him away from home a considerable portion of the time, and frequently at night. Most of the times when he would be absent, including at night, his wife would be alone in the home, and this, from time to time, caused protests to be made by her, and a naturally expressed desire that this feature of her husband's business be abandoned, which, however, was never done.

The plaintiff was notified before her marriage that her prospective husband's mother would be expected to live with them as a member of the household, to which arrangement she agreed. From some cause not shown by the record, disagreements arose between the plaintiff and the mother-in-law, resulting in the latter taking up her abode with another son after some seven or eight months following the marriage.

The defendant is shown to have been an industrious, economical and steady worker, but he was addicted to the habit of an occasional use of liquor up until some few years immediately preceding August 21, 1911, after which time, and until the latter date, he consumed it in excessive quantities. This became so prevalent and common that on the day mentioned his wife left him and remained away until November 6, 1911, at which time, through the intercession of friends, the parties became reconciled and agreed to terms which were embodied in a written contract that day executed. The only stipulation of that contract with which we have any concern in this case is that providing that the husband would abstain from the use of intoxicants forever afterward "whilst they lived together as husband and wife," and if he should fail to do so he would pay to

his wife the sum of $1,500.00, for which he executed to her his note with the foregoing condition contained therein. He was then treated for inebriety, and so far as the proof is concerned, he scrupulously observed his promise as long as he and his wife lived together. So without having to refer to this point again, and waiving the question as to whether this is such an obligation as may be enforced in law, the judgment appealed from in so far as it denied a recovery of the $1,500.00 is undeniably correct, and we will make no further reference to it except to say that in that contract the defendant admitted that "his wife was legally justified in leaving him, and that she so left him because of first party's excessive use of liquors and his consequent acts of wrong treatment of her growing out of the same; that their lives were happy at all times save by the use of liquor by the first party."

There were no children born of the marriage. It is shown without contradiction that the plaintiff was a most industrious and painstaking wife. She is shown to have constantly had in mind, even to an exceptional degree, the fulfilling of the requirements which might be expected of a faithful, assisting and economical helpmeet. She did almost without help all the household duties, including the cooking, and a large part of the washing. Sometimes when her husband was away she would attend to the stock on the farm, and she busied herself year after year raising poultry of different kinds, selling eggs and butter, from the proceeds of all of which she clothed herself and furnished a large portion of the clothing for her husband. Not only so, but from this source she furnished to him from time to time different sums of money as he would request, the largest amount at any one time being $80.00, and ranging from that on down to a paltry sum. From this same source, also, she purchased the organ and articles of personal property before mentioned, which she asked to be restored to her in this case. Her husband, although a man of good standing, and, so far as we can detect, an honorable, upright citizen, having filled the office of sheriff of his county, was lacking in his full, congenial affections so much necessary in a husband for the happiness of his wife. While in a way, and according to his manner, he appeared to be kind, still this was tempered with a noticeable coolness and indifference which chilled

the glow of the family fireside, and while he was what is known in common parlance as "a good provider," he was not a scatterer of sunshine in the pathway of his wife. He may not be to blame for this, as such conduct is frequently the outgrowth of a disposition for which the possessor is not responsible. For instance, he would not go with his wife to church, although she seems to have desired this and was a regular attendant herself. The only public gathering which the record discloses that he ever attended with her was the funeral of a neighbor occurring a year or more before the separation. He would seldom visit her people, and manifested indifference as to whether they visited his house. Yet, in all his conduct toward his wife, except that to which we shall hereafter refer, we find nothing smacking of the dishonorable, or subject to legal criticism.

Along in the fall of 1912 the defendant began visiting the home of James Browning, who was a tenant upon a neighboring farm, which visits he claimed were for the purpose of securing Browning as a tenant on his farm. Finally this was accomplished, and Browning and his wife, Amy Browning, moved into a house upon the defendant's farm and continued to live there until it was sold. The proof shows that before Browning and wife, the latter of whom is about thirty years of age, moved to the defendant's premises, his visits there would be frequent and sometimes lasting more than an hour, and at times when the husband of Amy Browning would be away. At one time, it was shown by witnesses, during such visit by the defendant, the door was closed and the blinds to the windows down. After Browning and wife had moved to defendant's farm he would frequently visit their house, and would be found talking to Mrs. Browning on the back porch, sometimes sitting close together, and at least upon one occasion procured Mrs. Browning to make a covering for a plant bed without having previously asked his wife to do so. At another time, when defendant was killing hogs, he and Mrs. Browning were found in a house or cabin nearby, talking to each other, while the plaintiff and Mr. Browning looked after matters growing out of the hog killing. On a number of occasions Mrs. Browning would take drives with the defendant in his buggy, and at one time rode upon his wagon, which, as we remember, was loaded with logs at the time. The

year before the separation Mrs. Browning gave birth to a male child which she named James Burns Browning. She, however, explains that she did this because she was very friendly towards both members of the Burns family. Some time before the separation the defendant purchased a house and lot in the town of Sardis, which he permitted the parents of Mrs. Browning to occupy, and after his wife went away in May, 1915, he went to the Brownings to board, and subsequently moved them into his own house in Sardis, where they were living at the time of the judgment.

On the fifth day of May, 1915, the plaintiff received word that her mother was seriously ill at Cynthiana, Kentucky. She immediately went there, and found her mother in a hospital, and she remained with her until she died, some fifteen or twenty days later, and never returned to her husband, filing this suit a short while thereafter. She claims some of the circumstances which we have related as to the conduct of defendant with Mrs. Brownig were not learned by her until after she went to her mother's bedside.

A few days before the plaintiff left her home the defendant went on a trip to Ashland, Ky., for the purpose of seeing about some timber land which he either had bought or was expecting to buy, to which his wife seriously objected, because, as she claims, she had learned that if the purchase was made it would necessitate her husband spending most of his time for at least a considerable while away from home looking after the enterprise, and that he expected to carry along with him Mr. and Mrs. Browning, this being one of the most serious causes of complaint on the part of the wife.

There are many other minor circumstances, more or less suspicious in their nature, a recitation of which would lengthen this opinion beyond proper limits.

As to what is necessary to show behavior of such a cruel and inhuman nature as to indicate a settled aversion on the part of the husband toward his wife, there is no settled rule except that the behavior need not rise to the point of brutality. Many times the behavior is such, though not violent and perhaps not intended, as to amount to almost serious cruelty because of the natural effect it may be calculated to produce upon the happiness of a loyal, affectionate and true wife. It is

equally true that the law, out of regard for the frailties of humanity, will not so magnify trivial differences and disputes as to sever the bonds of matrimony, or even decree separation from bed and board therefor. It is the cases coming between these two classes that give the courts the greatest difficulty.

Whether in this case the almost continued attentions of the defendant to Mrs. Browning and the many suspicious circumstances connected therewith are sufficient to establish the grounds of divorce alleged of his living in adultery, we do not feel called upon to determine, inasmuch as we are not authorized to disturb the judgment of divorce granted by the trial court. The only authority we have on this appeal is to determine whether the court under the proof properly adjudged to the plaintiff alimony.

Both by statute (section 2121, Kentucky Statutes) and numerous decisions of this court, if the evidence is such as to have justified a decree *a mensa,* the facts may be looked into upon the question of the allowance of alimony. McClintock v. McClintock, 147 Ky. 409; Freeman v. Freeman, 11 Ky. Law Rep. 824; Tilton v. Tilton, 16 Ky. Law Rep. 537; Zumbiel v. Zumbiel, 113 Ky. 841, and cases therein referred to.

By the section of the statute, *supra,* the court is justified in rendering the divorce from bed and board not only for the statutory causes for divorce, but "for such other cause as the court in its discretion may deem sufficient." So, for the purpose of determining the question before us on this appeal, it is only necessary to inquire whether the record presents "such other cause as the court in its discretion" may have been justified in granting alimony to plaintiff. Manifestly the "other cause" mentioned in the statute is one which in severity rises above the ordinary, common and trivial disputes and differences frequently occurring between husband and wife and falling below conduct such as to furnish cause for an absolute divorce. So the question is: Do the facts of this record show such "other cause" to exist? As we have seen, there is no evidence of any actually adulterous conduct between the defendant and Mrs. Browning, but there are undoubtedly many suspicious facts and much room for conjecture. All of this was practiced by the defendant openly before the wife, and over her protest. Upon a meeting which was had, and

which had been called for the purpose of discussing this matter, defendant admitted, in the presence of his brother and some neighbors, that he had been visiting the house of the Brownings and had been in the company of Mrs. Browning too much, and that he would thereafter, to use his own language, "wean off." He gave as his excuse for not quitting immediately that if he did so it would make her mad, and perhaps result in her husband leaving him, thus depriving him of a valuable and useful work hand.

While for the sake of argument it might be conceded that these acts did not amount to such cruelty or behavior on his part as to justify an absolute divorce for the first ground relied upon, and that it was not sufficient to establish the second one relied upon, still we are firmly of the opinion that his conduct, in apparent disregard of his wife's wishes, and with a knowledge on his part of the effect it was having upon her, abundantly justified the separation of the two from bed and board, and the allowance of alimony to the wife. A proper respect for the feelings of his wife and her happiness, and a due regard for the marital relation would have admonished him, first, to refrain from engaging in his questionable attentions to Mrs. Browning and repeated seeking of her company, and second, to immediately and willingly cease them upon his wife's tearful and pleading protest. Circumstances even less guilty in their nature have been determined by this court sufficient for the granting of a divorce *a mensa,* followed by alimony, as will be seen from the authorities, *supra,* and from which we do not deem it necessary to quote. We, therefore, conclude that the court committed no error in allowing to the plaintiff alimony.

This brings us to the question as to the amount of alimony, which was fixed, as stated, in the sum of $3,500.00, and which the appellant seeks to have denied *in toto,* or, if not, to have it reduced, but which the plaintiff, by cross-appeal, seeks to have increased.

We have heretofore discussed the industry, thrift and other characteristics of the plaintiff, and have also observed that all of the property possessed by the two at the time of the marriage was between $3,500.00 and $4,000.00. Without going into detail, the proof shows conclusively, to our minds, that the defendant now has at least $16,000.00, or perhaps $16,500.00, above all in-

debtedness, the great bulk of which is either cash or cash notes. The fruits of the union, then, so far as gathering together this world's goods, has been the accumulation of between $12,000.00 and $12,500.00, in which the wife was as faithful and as serviceable as was the husband. She has no property of her own. Her husband is yet comparatively young, strong, healthy and vigorous. She has been granted an absolute divorce, and is not qualified educationally to do many things in which she might otherwise engage. The best part of her life has been spent in an effort to accumulate a fund for herself and husband when the "rainy day" arrived. In the amount of alimony that should be allowed there is no limitation fixed by the law except that the court should be governed by a sound judicial discretion. This is but another name for exact justice and equity between parties under the precise circumstances presented. It is extremely doubtful that the defendant would have been enabled to add to his estate, without the assistance and co-operation of the plaintiff, anything approaching the amount he did, and it would be a harsh rule that would permit him, upon separation brought about by his conduct, to unduly share in the accumulations of their joint efforts during the marriage. In many instances, and under facts less appealing, this court has allowed to the wife as much, and sometimes more than one-third of the husband's estate. McClintock v. McClintock, 147 Ky. 409; Duvall v. Duvall, *idem*, 427; Sheehan v. Sheehan, 152 Ky. 191; Day v. Day, 168 Ky. 68; Pemberton v. Pemberton, 169 Ky. 476, and authorities therein cited.

If we should deduct the amount of property which the defendant had upon marriage, he will then have something like $12,500.00, and we think that both justice and equity dictate that it would be nothing short of extreme fairness to allow the wife as much as one-third of the property representing the accumulations during their married life, which in this case would be more than $4,000.00, the amount which she claimed. We, therefore, conclude that she should have been allowed $4,000.00, instead of $3,500.00, as alimony.

We would not be understood as fixing an inflexible rule as to the proportion of the husband's property that should be adjudged to the wife as alimony in all cases, but confine the opinion to the particular facts of this case as contained in the record.

The court, by its judgment, restored to the plaintiff the organ, but declined to' adjudge to her the other articles of personal property hereinbefore named and purchased by her in the manner stated. We are inclined to disagree with the court, and to adjudge that she is entitled to the articles mentioned. ᐟ

The plaintiff was allowed $300.00 as attorney fee, which she seeks to have increased by her cross-appeal. While the evidence is somewhat lengthy, there is not shown to be any difficult legal questions, and with the proof taken in the manner shown by the record (which was by shorthand) the time required to take it was not unreasonably long. So, under the circumstances, we are inclined to the belief that the allowed fee was sufficient, and the judgment in this particular will not be disturbed.

Wherefore, the judgment is affirmed upon the appeal, and reversed upon the cross-appeal, with directions to modify the judgment as herein indicated.          ·