## Watkins v. Watkins.

(Decided December 21, 1923.)

### Appeal from Fayette Circuit Court.

1.   Divorce—Husband and Wife—Husband Possesses Prerogative to Select Domicile.—The husband possesses the prerogative to select the domicile in which he and his wife shall reside, and under proper and ordinary circumstances this right is practically arbitrary, but he must act in good faith and be sincere and fair in all transactions relating thereto, and if so the failure of the wife to accept the domicile provided may be interpreted as abandonment, but the abode chosen must be commensurate with their past method of living or made necessary by misfortune.

2.   Divorce—One Intending Bringing Cohabitation to End Commits Abandonment—Plaintiff Must Show Separation Not His Fault.— It is immaterial which of the married parties leaves the matrimonial home, since the one who itends bringing the cohabitation to an end commits the abandonment, and one seeking a divorce for abandonment must show that abandonment was without fault upon his part.

3.   Divorce—Evidence Held to Show Husband at Fault for Wife's Abandonment.—In an action for divorce, evidence held to show that abandonment by wife was not without fault upon husband's part.

4.   Divorce—Matters Considered in Fixing Alimony.—In fixing amount of alimony, the court should consider the husband's estate, in-

come and earning capacity, as well as his age, his worth, and ability to labor, also that of his wife, the principal cause of the divorce, the relative responsibility of the parties therefor, and further ascertain whether the wife has aided in accumulating the husband's estate, and other pertinent facts obtainable.

5. Divorce—Amount of Alimony to Wife Who Lived with Husband Only Few Months.—Where persons divorced both had lived together only 8½ months, and husband was worth $27,000.00 and wife nothing, held, that wife was entitled to $7,500.00 alimony and $500.00 attorneys' fees.

J. T. FARMER, JOHN D. CARROLL and W. C. G. HOBBS for appellant.

O'REAR, FOWLER & WALLACE and ALLEN, BOTTS & DUNCAN for appellee.

OPINION OF THE COURT BY JUDGE ROBINSON—Reversing.

Appellee and appellant were married in Lexington, Fayette county, Kentucky, February 5, 1919, and lived together as husband and wife until the 16th day of October, 1919, a period of about eight and one-half months. It appears from the evidence that during this short time there had been a number of dissensions between them, all of which, however, were of more or less trivial nature.

Appellee was a member of the Methodist church, while his wife belonged to the Christian church, and desiring to attend a convention of that faith to be held in Cincinnati, she, with the full consent and approval of her husband, arranged to be there on October 16th. Before her departure appellee kissed her good-bye, promising that he would either come to Cincinnati for her on the following Sunday, at which time the convention ended, in his machine, or in any event would send for her, owing to the fact that travel by train generally made her ill. Appellant remained in Cincinnati from the 16th until Sunday evening, the 19th, when leaving the convention hall accompanied by a friend with whom she had been staying, they found standing in front of the door two employees of appellee, who stated that they had been sent there to accompany her home, and at the same time delivered a letter from appellee. This she placed in a small hand satchel and they drove to the home of her friend, and, after securing a valise, started on the homeward journey. Appellant states that while in the house

she, thinking the letter contained some money, opened it and upon discovering only a written sheet did not take it from the envelope, as she was hurried and intended reading it on her return to Lexington. At this time one of her escorts suggested that they stop in Cincinnati for dinner, to which she replied, "No, we will reach home in ample time for that, and there is no necessity for waiting."

It seems that before reaching the outskirts of the city they again repeated this suggestion and she answered in the negative. Upon arriving in Lexington she states that just before reaching her home one of the employees of appellee who was in control of the car said: "Where do you wish to go?" Her answer was: "To my home, of course; where do you think I wish to go?" and just as she alighted from the car he said: "Shall we wait for you?" and she replied, "I am at home; there is no necessity for your waiting." She further says she found the house in total darkness, every door being locked; and upon endeavoring to insert her keys, discovered that they would not fit any of the locks, all having been changed in her absence. She then went to the home of a neighbor, and after securing assistance managed to effect an entrance through a back window, and discovered the house in complete disorder, much of her furniture and wearing apparel and other articles having been removed. She then took from her hand satchel the letter that had been handed to her in Cincinnati and read the following:

"Mrs. Mollie G. Watkins,
    884 Lincoln Ave.,
    Cincinnati, Ohio.

"Dear Mollie:

"For certain reasons I find it impracticable and that I am unable to continue to reside in the residence at No. 322 East Maxwell street in this city, or to continue housekeeping there and have rented the house and given possession to the tenant.

"In order to provide you with a home, I have secured for your use a furnished room in the residence of Mrs. Lizzie Wilson Baird's at No. 207 East Maxwell street in this city, which is in every way suitable and ready for your occupancy; and have arranged for your meals at Mrs. H. L. Ramsey's at No. 238 East Maxwell street, which is quite near and

convenient to the room at Mrs. Baird's; and I have arranged for the payment for the room and meals, and will settle for same with these ladies.

"Such as your furniture and other articles which were in the house at No. 322 East Maxwell, and which could be placed in the room at Mrs. Baird's I have had removed and placed in this room and the remaining articles I have had removed to the store-room of John Wilward's on Second street in this city, and instructed him to hold them or dispose of them as you may direct.

"I trust you will find this arrangement satisfactory.

"Yours,

"James L. Watkins"

Just as she finished this letter the door bell rang, and supposing it to be her husband, she answered at once, finding on the threshold another employe of appellee who asked, "What are you doing here?" to which she replied, "I am in my home where I belong; what do you want?" His answer was, "Well, you can leave here at once; I have rented this home from your husband," and exhibited a lease for the house at a rental of $75.00 per month; and further stated: "This property is mine now, and you leave here." This she declined to do, going to her room where she spent the night; and the alleged lessee also went to a room where he remained, leaving the next morning and never returning to enjoy the benefit of his supposed lease. Appellant further states that she had no conception of the contents of the letter above referred to until after reading it in the home upon reaching Lexington, and this would appear true as in the evidence of the escorts they stated that she seemed cheerful and bright *en route*, and it is scarcely possible or reasonable that any woman, the recipient of such a missive, could have retained her composure under such a trying ordeal.

It does not necessitate minute inspection or profound reasoning to reach the conclusion that this letter was a carefully penned and shrewd attempt to acquaint appellant with the fact that appellee had abandoned, and did intend to abandon, her in no unmistakable manner, leaving small room for doubt in her mind that their marital relations were at an end. It will be observed in the second paragraph of his letter he says: "I

have secured for *your* use a furnished room" and "ready for *your* occupancy;" "have arranged for *your* meals;" and in the third paragraph, "such as *your* furniture;" and speaking of the furniture that he had stored, "I have instructed that it be held or disposed of as *you* direct." Could there be more conclusive proof of absolute abandonment than this letter or more unmistakable evidence that appellee, for some reason having grown tired of appellant and finding his marital relations burdensome and distasteful, employed this means of severing the obligation into which they had sacredly entered only eight and a half months previously? True he had secured this small room as he mentioned, or as the testimony afterward shows, two small rooms into which he expected appellant to move; but had he been the true, loving and affectionate husband, as he so forcibly proclaimed himself to be later in the evidence, or if anything had prevented his complying with his promise to drive to Cincinnati to meet his wife, he would at least have met her at their old home and conducted her to the new quarters. Instead of this, however, we find him in a luxurious apartment at the Phoenix Hotel, apparently with neither desire nor intention of being with his mate or sharing with her the insignificant little apartment mentioned; and it is clearly demonstrated and shown that by a preconceived and prearranged agreement with his employees, who returned to Lexington with appellant, they were expected to drive her to this apartment when they asked, upon reaching the former home, "Where do you wish to go?"

It is shown that neither appellant nor appellee was a novice in the matrimonial game, he being a widower 59 years of age, and she a widow of about 42, both, doubtless, from past experience in a position to realize that in all married lives the sunshine may at times be marred by little differences that might have been avoided by a reasonable display of common sense or forbearance. The evidence discloses that during the brief period they lived together appellee insisted frequently that appellant make her will, she being possessed of 126 acres of land (for the purchase price of which she was still considerably in debt) and a dower interest in a like amount. To this she demurred, stating that she was not ready to execute this instrument. It is further shown that upon the last occasion when he made this request he asked that she tell him just how she would make this will when she con-

cluded to do so. Her reply was, "Fifty-fifty; one-half to my son (now 19 years of age), and one-half to you," upon which she alleges he grew indignant and said, "The son under no circumstances is entitled to more than $2,000.-00." On the other hand, in the testimony of the appellee he alleges that his wife ridiculed his church connections, and in many ways was disagreeable and unpleasant, making life a burden for him; that she was wildly extravagent; and his reason for leasing the home and endeavoring to force her into the small quarters was due to the fact that their living expenses were greatly in excess of his income. This appellant denies and claims that she lived well within his means, frequently doing her own cooking, and the uncontradicted evidence that she cared for and administered to the wants of the aged and infirm mother of his first wife (who made her home with them) would go far toward proving an amiable and generous disposition on her part.

After repeated efforts of appellant to induce appellee to return to their home, and upon his refusal so to do she, on February 13, 1920, filed suit in the Fayette circuit court for maintenance, alleging cruelty and abandonment on the part of appellee. She further set out the fact that he was possessed of large means, being the principal stockholder in the corporation of Smith-Watkins & Company, secretary and treasurer of the Henry Clay Fire Insurance Company, and the owner of their residence on East Maxwell street, as well as considerable stock in the Phoenix Hotel Company and other interests in the city of Lexington. She further alleged that since the 19th day of October, 1919, appellee had not contributed anything toward her maintenance and support. In this petition she asked the court to fix a proper allowance for her support, and that she be allowed to continue her occupancy of the house on East Maxwell street, and he be required to defray the expenses of her litigation, including attorneys' fees.

On the 9th of March, 1920, appellee filed his answer and counterclaim, alleging abandonment, and filing copy of his letter to her under the date of October 19th. This we feel constrained to say falls lamentably short of proving abandonment on her part, making it only the more apparent that his embrace and kisses upon her departure for Cincinnati were not prompted by true affection but improper motives. The answer further alleges that appellant owned 126 acres of land in Fayette county and

is possessed of dower interest in a like amount, and states it is worth $50,000.00, which, after comparison with prices of land of that character, would amply prove the allegation absurd. He further prays that he be adjudged in no fault of his legal obligations to plaintiff, and that her petition be dismissed and that the house on Maxwell street be restored to him.

On February 13th, 1920, appellant filed interrogatories containing eleven questions addressed to plaintiff relative to his financial standing and holdings. These were taken on March 9, 1920; and after answering them, appellee proceeded to give a history of his life covering 19 pages, in which he recited in detail much that was irrelevant and probably incompetent, but from which lengthy effusion we fail to find one single fact that would tend to show either a moral or a legal reason wherein he was justified in attempting to summarily eject his wife from their home or bring about a speedy termination of their marital relations.

Appellee in his testimony alleges that the necessity for his leasing the home and moving his wife to other quarters arose from the fact of unwarranted household expense that he could not meet, and in exhibit "D" (filed with his answer and counterclaim) a monthly expense account is shown in which we observe in the first month, for alleged household expenses, are included $33.00 for his club dues, $233.00 church contributions, and $25.00 for united war work. Just how appellant could be charged with this for household expenses we are at a loss to determine, and the same applies throughout the accounts furnished during their married life.

On April 20, 1920, appellant filed her reply to the counterclaim of appellee, which was a general denial of the allegations contained therein, admitting, however, that at one time prior to her trip to Cincinnati appellee did state to her that he thought their household expenses should not exceed the sum of $3,000.00 per year, that she agreed readily to this proposition and could have easily accomplished the desired end if the account had not been charged with so many personal expenditures of appellee, of which she was in nowise the beneficiary or in any manner responsible. Appellant admits the ownership of the 126 acres of land in question, also her dower right in like amount, but it is shown that after the payment of the purchase price of this property and other legitimate obligations, her income from it or its worth to her would

be exceedingly small, and practically since October 16, 1919, her only means of support was derived from renting rooms in the house of appellee and appellant on East Maxwell street.

Appellee's rejoinder filed on the 23rd day of October, 1920, was simply a denial of the allegations contained in appellant's reply, and on November 20, 1920, he filed an amended and supplemental answer and counterclaim in which he prayed for an absolute divorce from appellant, alleging abandonment for more than one year; and it will be here observed that this abandonment is said to have occurred exactly one year and one day from the memorable date of appellant's return from Cincinnati to find her home deserted and the doors locked against her. On the first day of February appellant filed a general denial to the amended and supplemental answer and counterclaim of appellee and on April 21, 1921, tendered an amended reply containing terms of endearment and a pitiful plea to appellee to return to their home that the past might be forgotten, and promising to make an earnest endeavor in every conceivable manner to renew the happy life and marital relations that had been for some time disturbed. To the filing of this amended reply, however, attorneys for appellee objected and were sustained by the court.

It is further shown by the evidence that during the separation she resorted to every means within her power to induce appellee to return, enlisting on several occasions the pastor of her church, a well known minister of Lexington, who visited appellee and remonstrated with him, pleading that he return to his wife who was waiting with open arms and a ready and affectionate welcome. These requests were met with a curt refusal and upon the last occasion he was referred to attorneys for appellee for any information desired as to his intentions.

In the voluminous testimony taken on behalf of both appellant and appellee we fail to discover one mitigating circumstance or possible excuse for the unfeeling letter addressed to appellant on October 19, 1919. True appellee accuses her of having abandoned him by refusing to proceed at once to the rooms that he had rented for her, and alleges this as ample grounds for the divorce applied for, in which contention he was upheld by the court in its judgment granting him a divorce and denying his wife an allowance of any kind or attorneys' fees. If appellant had not secured the testimony of many prominent and highly respected citizens of Lexington and the

surrounding country wherein she was shown to be a woman of exemplary character, of exceedingly kind, affectionate and lovable nature and one calculated to honor and grace appellee's home; and if we considered alone the testimony of equally respectable persons in his behalf, we could, nevertheless, have reached but one inevitable conclusion, to the effect that appellee deliberately abandond appellant, and, further, this abandonment was preconceived, prearranged and concocted prior to her leaving their home to attend the convention of churches in Cincinnati; and that his entire willingness to consent to this visit was considered by him as the long wished for opportunity to put into force and effect the designs so carefully conceived.

It is held by authorities that the husband possesses the prerogative to select the domicile in which he and his wife shall reside, and under proper and ordinary circumstances this right is practically arbitrary. Nevertheless, he must act in good faith and be sincere and fair in all transactions relating thereto; and if so, the failure of the wife to accept the domicile provided and a refusal on her part to accompany him could easily and properly be interpreted as an abandonment; but scarcely so when the abode chosen is not commensurate with their past method of living or made necessary by misfortune, financial reasons or other circumstances warranting a change in their method of living, and the question here arises, did appellant abandon appellee or did he without justification desert her? In 19 C. J. 56 it is said:

"Desertion or abandonment consists in the voluntary separation of one spouse from the other for the prescribed time without the latter's consent, without justification, and with the intention of not returning."

When appellee sent his wife to that dark and dismal house bolted against her did he intend to return? We think not.

We further find in Bishop on Marriage, Separation and Divorce, vol. 1, 709, the following:

"It is immaterial which of the married parties leaves the matrimonial home; the one who intends bringing the cohabitation to an end commits the desertion."

In this case appellee deserted the home of appellant, and in Bishop v. Bishop, 155 Ky. 679, the court says:

"One seeking a divorce upon the ground of abandonment must show that the abandonment was without fault upon his part."

Suppose for the sake of argument we admit that appellant deserted appellee by not repairing at once to the room he claims to have secured for her, can he ask immunity from the guilty knowledge that he had first left their home on Maxwell street with the intention of never returning to it or to her? In Herold v. Herold, 9 L. R. A. 696 (O. S.), the court said:

"It is abundantly established that a husband who, not being blameless for the act, makes no effort to prevent his desertion by his wife, and appears to acquiesce in and be satisfied with its continuance, cannot appeal successfully to the court for a divorce on the ground of desertion."

In this action appellee, instead of making an effort to prevent desertion by his wife, apparently endeavored to bring it about, and seemed satisfied with the luxurious surroundings to be found within the confines of a noted hotel. In Tirrell v. Tirrell, 47 L. R. A. (O. S.) 750, the court in defining desertion under a statute very similar to ours said:

"Desertion by a husband of his wife, as intended by this statute, means 'a willful absenting himself from the society of his wife with the intention on the part of the husband to continue to live apart in spite of her wish, and without any intention to return to cohabitation.' . . . The statutory offense of desertion, as we have seen, contains in it the intent to put an end to the marital condition and the intent never to renew it."

In Pfannebecker v. Pfannebecker, 119 A. S. R. 608, we find:

"To constitute desertion as a cause for divorce there must not only be a separation, but also an intent to cease to live together as husband and wife."

Referring again to the evidence it fails to show that appellee ever requested his wife to occupy the rooms that he had secured, or give up the house in which they had

lived, or live with him in any place since that memorable letter of October 17th; nor did he apparently make any attempt at reconciliation although she did on numerous occasions.

In 19 C. J. 63 it is said:

"The general rule is that before a husband can secure a divorce on the grounds of his wife's desertion, he must attempt to effect a reconciliation; and this seems to be the better rule, even though the wife was at fault and the husband free from blame."

In Sanders v. Sanders, 184 Ky. 119, in a case that we feel is very much in point, the court said:

"The statute not only requires as an element of this ground for divorce that there should be an abandonment by defendant without fault of the plaintiff, but such abandonment must continue without his fault for twelve months. If he is in fault in bringing about either of the elements necessary to complete the ground, he cannot be allowed to complain. Hence, the law requires that plaintiff in relying upon the wrongful abandonment in his suit for divorce must not only allege and prove the fact of twelve months' abandonment, but he must further show that both the abandonment and its continuity for twelve months were without fault on his part . . . a wrongful abandonment alone will not authorize a judicial separation. An additional proof of time following the abandonment (varying in different jurisdictions) is fixed, during which the offending party may repent and return to the abandoned home, thus affording an opportunity for reconciliation. If within that time such a purpose is manifested, it is the duty of the one abandoned not to obstruct that purpose, and if he does so he cannot be said to be without fault, unless the reason for his action is itself sufficient to constitute ground for divorce."

In our opinion it does not appear that appellant ever abandoned appellee, but even if this erroneous construction could be placed upon her actions, did she not on numerous occasions use every means within her power to effect a reconciliation, all of which were repulsed by appellee?

This court does not hold, though others have, that it is the duty of the husband when entirely without fault

for a desertion to seek a reconciliation with his wife, but we think in the numerous cases considered his action in refusing affords ample authority for holding that upon his own as well as all of the testimony he did not come into the court with clean hands, and that he was entirely responsible for the alleged abandonment and for its having continued for such a length of time as to constitute grounds for a divorce on the part of appellant. See the following cases: Finley v. Finley, 9 Dana 52; Epling v. Epling, 1 Bush 75; Becket v. Becket, 17 B. Monroe, 294; Adair v. Adair, 31 Ky. L. Rep. 956; Pope v. Pope, 161 Ky. 104; Rice v. Rice, 166 Ky. 289, 179 S. W. 200; Mayes v. Mayes, 115 S. W. 717; Yeager v. Yeager, 197 Ky. 353.

We are therefore of the opinion that the chancellor erred in granting the divorce to appellee and denying to appellant alimony and attorneys' fees.

It is shown by his testimony that he is worth at least $27,000.00 free of all encumbrances, and we are convinced his holdings are greatly underestimated; and, further, he admits his income to be from seven to ten thousand dollars per year.

We have frequently held that in fixing amount of alimony the court should consider the husband's estate, income and earning capacity, as well as his age, his worth and ability to labor, also that of his wife, the principal cause of the divorce, the relative responsibility of the parties therefor; and, further, ascertain whether or not the wife has aided in accumulating the husband's estate, and other pertinent facts obtainable. See Shehan v. Shehan, 152 Ky. 191, 153 S. W. 243; Burns v. Burns, 173 Ky. 105, 190 S. W. 683.

This being the second marriage for both parties, and considering the fact that they had lived together only about eight and a half months, it is clearly shown that she had no part in the accumulation of any of his estate; nevertheless, he assumed the burden of her support when they entered into the marriage contract, and evidence discloses the fact that she is now practically without means and past that age when she might enter the world to earn a competent livelihood. However, we feel that $15,000.00 as prayed for by appellant as alimony and the continued residence in the home of appellee on East Maxwell street is rather excessive; but are of the opinion that she is entitled to alimony in the sum of $7,500.00, and that her at-

torneys for their services should receive $500.00, to be taxed as costs and paid by appellee.

Wherefore, so much of the judgment as denied alimony and attorneys' fees is reversed, with directions to enter a judgment for appellant as herein indicated.