## Patrick v. Patrick.

(Decided February 14, 1928.)

### Appeal from Daviess Circuit Court.

1. Divorce.—Under Ky. Stats., sec. 2121, judgment for separation or divorce from bed and board may be rendered for any of causes which allow divorce, or for such other cause which court in discretion may deem sufficient.

2. Divorce.—The Court of Appeals should not disturb the judgment of a chancellor in divorce case, where the mind is left in doubt on issues of fact.

3. Divorce.—In wife's suit for divorce a mensa et thoro and for alimony, alleging that husband habitually behaved toward her in such cruel and inhuman manner as to indicate settled aversion and to destroy permanently her peace and happiness, chancellor

held under weight of evidence to have judicially exercised discretion in denying her relief.

LOUIS I. IGLEHEART for appellant.

G. H. CARY, C. W. WELLS and H. A. BIRKHEAD for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The appellant filed her suit in the court below against appellee seeking from him a divorce a mensa et thoro, and to recover from him the sum of $5,000 as alimony. Her grounds for divorce were that appellee habitually behaved towards her for a period of not less than six months in such a cruel and inhuman manner as to indicate a settled aversion to her, or to destroy permanently her peace and happiness. The lower court denied her the relief sought.

The questions presented are ones purely of fact to be gathered from the testimony in the record with the application of the rules of law prevailing in such cases. They were married on June 26, 1921, in Owensboro, Ky. At that time appellant was 28 years of age, and appellee was 53. Each of them had been married before. Appellant had one child by her previous marriage, and appellee had three children by his former marriage, and he also had in his home an adopted boy about the same age as that of the young son of appellee. At the time of the marriage these two boys were 9 and 10 years of age. There was a thorough understanding between appellant and appellee before the marriage, and it was understood that the son of appellant should be a member of their household. The adopted son of appellee and a grown daughter were also members of the household.

The testimony showed that appellant was a good woman so far as her moral character is concerned, and that she was intelligent and possessed of qualities of refinement. The testimony showed that appellee was a substantial citizen having the respect and confidence of those who knew him. They were members of the same church, and the proof showed that they had been active in their church work. Appellant is described as a religious woman, who took much interest in the activities of her church. The proof also showed that appellee contributed more largely towards the support of his church than any other member, and that he had been honored as a representative from his local church to one of the great conventions of his denomination. Appellee was a man of

small property, although able to support his family in reasonable comfort.

There was something lacking in their marital relations from the beginning. The testimony conduces to show that appellee was deeply in love with his wife, although he was a silent, undemonstrative man, who had an inadequate way of expressing his love. Appellant complains that the children of appellee ·mistreated her, and there is some proof that they did not show her the respect to which she was entitled, but the proof did not show that this disrespect was greater than might have been expected judging from the usual experiences of life under such circumstances. The adopted son of appellee struck appellant on one occasion, and she claimed that the blow broke a rib. Appellee testified that he never heard of any such incident. She claimed that the boy struck her on the nose with his fist while she was giving him a bath or washing his ears, but appellee denied that he saw any such conduct. Appellant testified that her husband was close, stingy, and miserly, but in this she is not supported by a preponderance of the evidence. It is claimed by her that he possessed a surliness of temper and that he was at times abusive and used offensive language to her. We do not agree that the evidence shows that he possessed a surly temper, but it does show that he was inclined to be silent when the trivial disagreements between her and his children were brought to his attention. There is very little evidence that he ever used offensive language to her. It is testified to by appellant that appellee did not show proper sympathy for her when she was ill, but those who testified for her on that point went no further than to say that he went to his work and left her at home at times when she was too ill to look after herself, and that he did not inquire about her condition when he returned from his work. On the other hand, he denied all of this, and his conduct after she left him tended to show that she was mistaken in attributing to him any intentional neglect.

Appellant testified that she had been brought up to ask a blessing before meals, and that appellee objected to it and that his children showed such irreverence about it that she abandoned doing so. This is all denied by appellee and his children. She complained that at night she undertook to teach her child and his children their Sunday school lessons, and that she prayed at night before retiring, and she stated that her husband objected

to all of this and directed her to turn out the light, as he did not want it shining in his face and because the light bill would be increased. This is all denied by appellee and his children. It was testified to by appellant that appellee did not attend Sunday school; but if that should be made grounds of divorce in this state a majority of wives could go into the divorce courts with absolute as-- surance that they could make out a case against their husbands. It is regrettable but true that men do not attend Sunday school as they should. It was testified to by appellant that the adopted son called her "old woman" and "Peggy Jane" and other such unbecoming names. Many boys apply the same terms affectionately to their mother, and it is usually accepted by her as a compliment rather than as a cause for divorce. She testified that on Monday after they were married on Saturday she discovered there was no meat in the house, and she called appellee's attention to it, and he replied that: "We will get by." They had only three slices of meat, and when they sat down to the table, so she said, appellee took all three of the pieces. Evidently appellant had been living in the country where it was not the custom to buy groceries from day to day or from meal to meal. She testified that he fussed about the amount of his bills when they were sent to him. That is one of the few prerogatives that a husband still has. In addition to his failure to furnish sufficient food, she testified that he would not buy clothes for her and that when she left him she had only one pair of hose and one gown, and that she had no underwear whatever. In response to this appellee testified that he had never bought such things for any woman and that she had the privilege of buying whatever she pleased, and he supported that testimony by other witnesses. The neighbor women and the washerwoman testified that appellant had an abundance of clothes, and the adopted son testified that he knew she had at least four white night gowns, because some of them had no sleeves and had lace around the neck. He seemed to know what he was testifying about. He was also corroborated by the washerwoman.

For some reason not made clear she decided to work, and for a while she sold corsets. She stated that she made about $400 in this business and that she used it all for household expenses. She clerked in a store for awhile and earned a little money in that way, and this also went for household expenses. Appellee testified that she lost money on her corset venture, and admitted

that she worked awhile in a store over his protest and objection. The testimony showed that she did not remain at home as much as appellee thought she should. She was active in her church work, took some interest in politics, and devoted some time to civic matters. She testified that she had lost all confidence in appellee growing out of the fact that he lied to her. She mentioned the things about which he had lied to her, and they were not such as ought to cause a wife to lose confidence in her husband. Her standards were rather high, and while it is to be hoped that some women have husbands such as she expected hers to be, yet we are persuaded that the fond hope of such husbands is the musings of a dreamer. She said that he promised to give her an automobile and within two weeks he forgot that he had promised to give it to her. That was one of the unforgivable lies that she mentioned. The proof showed that he did buy a new automobile, for which he paid a rather large sum of money for a man in his financial circumstances, and that she had the liberty and privilege of using the automobile without let or hindrance at that time, and that he paid in the main all gasoline bills and other bills in connection with its use. It is true that the proof showed that he took her to Sunday school in the automobile at times when he did not remain, but went to a farm that he owned out in the country, and that she was compelled to ride home on the street car. She testified that on one occasion when she was ill he compelled her to go to his farm and get a load of apples and bring them to the city and peddle them. This he denied.

The proof showed that he had a good home and that it was equipped with modern conveniences. The appellant was not happy in the home, as is disclosed by the evidence, but we are persuaded that she would not have been happy in any home if she was compelled to live with her husband. We do not know the reason, but it is apparent that there was an antipathy on her part towards him. She did not claim that she loved him, or that she had ever loved him, and we are convinced that the seat of all the trouble is that she married a man that she did not love. Although not able to stand the expense, he built a new house, which he testified was at her suggestion, and that he allowed her to draw the plans and specifications, and that he gave her full authority to superintend the construction of the new home. They moved into it, but no happiness was found there. At last she went away, and he frantically besought his friends to persuade

her to return. Her pastor and those who worked in her church were requested by him to use their influence with her. He finally met her at the study of his pastor, or one of his assistants, and he there begged her on his knees to return to him, and promised her that if he had been derelict in his duty in the past that he would mend his ways; but nothing made any impression on her. She showed neither sympathy not interest in his distress.

It is true that a judgment for separation or divorce from bed and board may be rendered for any of the causes which allow divorce, or for such other cause as the court in its discretion may deem sufficient. Such is the provision of section 2121, Ky. Stats., and so it has been held by this court. Humphries v. Humphries, 214 Ky. 397, 283 S. W. 391; Burns v. Burns, 173 Ky. 105, 190 S. W. 683; Phillips v. Phillips, 173 Ky. 608, 191 S. W. 482; Ramsey v. Ramsey, 162 Ky. 741, 172 S. W. 1082; Zumbell v. Zumbell, 113 Ky. 841, 69 S. W. 708, 24 Ky. Law Rep. 590.

In the case of Phillips v. Phillips, supra, the court, in referring to the discretion vested in the chancellor, said:

"The discretion thus conferred is not, however, to be understood as arbitrary or unlimited, but a sound legal discretion, which is only to be exercised for such causes as may be deemed sufficient, when considered with a just and reasonable regard to the rights and obligations of both parties."

This court should not disturb the judgment of the chancellor in cases such as this where the mind is left in doubt on the issues of fact. The chancellor is closer to the people who live and move and have their being about him than this court, and he is in better position to weigh the evidence than we are. It will not be presumed that the chancellor exercises his discretion other than according to his intelligent judgment applied to the facts. If that be the law, and under our system of jurisprudence and under the decisions of this court it is the law, we should find something in the record which convinces us that the chancellor has not judicially exercised his discretion on a question of fact in a case such as this before we should reverse his judgment. The chancellor entered judgment in accordance with the weight of the evidence in this case. The responsibility was on him, and he has discharged his duty within the limitations of the law.

Judgment affirmed.